**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 09-656 (SDW) |
| Plaintiff, | |
| v. | **OPINION** |
| GORDON D. MCDONALD, | |
| Defendant. | July 2, 2020 |

**WIGENTON,** District Judge.

Before the Court is Defendant Gordon D. McDonald's ("Defendant") Motion for Compassionate Release and Reduction of Sentence under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). (D.E. 406.) This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendant's motion is **DENIED**.

### I.      BACKGROUND AND PROCEDURAL HISTORY

On August 31, 2009, Defendant was indicted for conduct in connection with a wide-scale fraud scheme involving his shell company and the procurement of United States Government contracts. (D.E. 1.) On September 30, 2013, after an eight-day trial (*see* D.E. 139–42, 144–46, 150–51), a jury convicted Defendant on ten of twelve criminal counts.[1] (D.E. 155; D.E. 175 at 1.)

In 2010, during the pendency of his criminal proceedings and prior to his sentencing, Defendant was involved in a motor vehicle accident that left him with serious medical challenges,

---

[1] Specifically, Defendant was convicted of conspiracies to provide various kickbacks and to commit fraud, major fraud against the United States, conspiracy to launder monetary instruments, bid rigging, the filing of false tax returns, and obstruction of justice in violation of 18 U.S.C. §§ 371, 1031(a), 1512(c)(2), and 1956(a)(2)(A); 15 U.S.C. § 1; 41 U.S.C. §§ 53 and 54; and 26 U.S.C. § 7206(1). (D.E. 155; D.E. 175 at 1.)

1

including malignant hypertension (high blood pressure), which has caused Defendant to suffer numerous strokes. (D.E. 406-1 at 4–6; D.E. 408 at 15; *see* D.E. 177 (Transcript of March 3, 2014 Sentencing Hearing ("Tr.")) 42:1–6.) Defendant also has a thoracic aortic aneurism, heart disease, a history of lung cancer, vision and hearing loss, and a loss of mobility. (D.E. 406-1 at 6–8; D.E. 408 at 15.)

When imposing sentence, this Court considered Defendant's physical, medical, and neurological status that resulted from the accident, and was satisfied that Defendant's medical challenges could be addressed appropriately by the Bureau of Prisons ("BOP"). [2] (Tr. at 46:4–24 (noting that when Defendant "committed these offenses, . . . there was no impairment that existed" but recognizing that "[Defendant is] in a more challenged medical state"); *see* 49:5–8.) Defendant was sentenced to 168 months imprisonment and one year of supervised release. (Tr. 49:17–50:2; D.E. 175 at 3–4.)

Defendant has served less than half of his fourteen-year sentence and has been detained at the Federal Medical Center in Lexington, Kentucky ("FMC") since August 2016. (D.E. 406-1 at 4–5; D.E. 408 at 5 n.5, 22; D.E. 411 ("Billings Decl.") ¶¶ 4, 8(a).) On July 19, 2019, Defendant suffered a stroke which prompted his transfer to FMC's F-4 Unit where he "receives around the clock assistance from health care workers." (D.E. 406-1 at 8; *see also* Billings Decl. ¶¶ 5, 8(b).) Defendant is currently the only occupant in a hospital-style room. (Billings Decl. ¶ 8(b).) FMC's F-4 Unit is "a nursing care center unit" that "houses patients in need of intensive primary care management which requires 24-hour nursing services." (*id.*; *see also* D.E. 409 at 6; D.E. 406-1 at

---

[2] For example, although the Probation Office calculated Defendant's base offense level at forty, the Court declined to apply a two-level enhancement for obstruction of justice after it considered the medical challenges Defendant faced following his accident. (Tr. at 37:18–20; 41:10–43:4.) Thus, the Court calculated Defendant's base offense level at thirty-eight, which was reduced further to a level thirty-five after consideration of Defendant's prior criminal history, characteristics, and medical status. (*Id.* at 49:4–13.) At the time of sentencing, Defendant had a criminal history category of one "with no prior criminal history." (*Id.* at 44:6–7; 49:13.)

2

8.) As discussed in detail below (*see infra*, Section III.B.ii), FMC has implemented various measures to combat the spread of COVID-19 in its facility, including the F-4 Unit. Only one inmate in the F-4 Unit previously tested positive for COVID-19, and as of June 24, 2020, there were no active cases of COVID-19 in the unit. (Billings Decl. ¶¶ 6(e)–(f), 8(c).). Defendant tested negative for COVID-19 on May 21 and May 29, 2020. (*Id.* ¶ 8(c).)

While in custody, Defendant filed at least two requests for compassionate release with the BOP. (*See* D.E. 406-1 at 2–3.) Defendant's first request for compassionate release was filed on or about October 19, 2016. (*See* D.E. 406-2, Ex. A.) Notwithstanding the FMC Warden's recommendation that Defendant receive a "term order release" under 18 U.S.C. § 3582(c) (*see* D.E. 406-3, Ex. B), the BOP's Assistant Director/General Counsel denied Defendant's request on May 17, 2017. (D.E. 406-4, Ex. C ("May 17, 2017 BOP Denial") at 1–2 (recognizing Defendant's "history of cerebral vascular disease with residual left-sided weakness, malignant hypertension, thoracic aorta outpouching with plaque, lung cancer with right lower lob lobectomy, seizure disorder, and coronary heart disease," and use of a wheelchair, but finding that he was "independent with his activities of daily living such as grooming, brushing his teeth, feeding himself, dressing, and bathing").

Thereafter, Defendant contends that, in 2018, at least two additional requests for compassionate release were filed on his behalf—one by his son, Kevin McDonald, Esq., and another by an individual named Amber Farmer. (D.E. 406-1 at 3; *see* D.E. 406-5, Ex. D.) On March 4, 2019, the BOP's Assistant Director/General Counsel notified Amber Farmer that Defendant's facility would evaluate him for a reduction of sentence based on his medical status. (D.E. 406-5, Ex. D at 4.) Subsequently, on April 18, 2019, FMC's Warden received a request for compassionate release that was purportedly sent by the Defendant. (*See* D.E. 408-2, Ex. A.)

3

Approximately four months later, on August 6, 2019, the BOP's Assistant Director/General Counsel denied a request for Defendant's compassionate release/reduction of sentence.[3] (D.E. 408-3, Ex. B ("Aug. 6, 2019 BOP Denial").)

In the midst of the COVID-19 pandemic, Defendant filed the instant motion seeking compassionate release and a reduction in sentence to time served followed by one to three years of supervised release. (D.E. 406; D.E. 406-1 at 13.) Defendant argues that "extraordinary and compelling reasons" justify a reduced sentence because (i) he suffers from an incurable and terminal illness; (ii) he is incapable of providing self-care, and (iii) he is at an increased risk of contracting COVID-19 and dying from the virus given his present medical ailments and confinement at FMC. (D.E. 406-1 at 6–20.)

## II.  LEGAL STANDARD

Although a district court generally has limited authority to modify a federally-imposed sentence once it commences, *see United States v. Epstein*, No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020); *Dillon v. United States*, 560 U.S. 817, 825 (2010), the recently-enacted First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A)(i), permits district courts to grant compassionate release where "extraordinary and compelling reasons" exist to reduce a sentence. The statute provides, in relevant part, that:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are

---

[3] It is unclear whether the August 6, 2019 denial was in response to either Kevin McDonald's or Amber Farmer's request, or the request submitted on April 18, 2019. (*See* Aug. 6, 2019 BOP Denial.)

4

>applicable, if it finds that—
>(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c). As such, under the FSA, "a defendant seeking a reduction in his term of imprisonment bears the burden of establishing both that he has satisfied 1) the procedural prerequisites for judicial review, and 2) that compelling and extraordinary reasons exist to justify compassionate release." *Epstein*, 2020 WL 1808616, at *2 (citing 18 U.S.C. § 3582(c)(1)(A)).[4]

## III.  DISCUSSION

### A. Exhaustion of Administrative Remedies

Under Section 3582(c)(1)(A) a defendant seeking a reduced sentence must ask the BOP to do so on his or her behalf and either (i) wait thirty days for the BOP to respond or (ii) exhaust all available administrative appeals after receiving an adverse decision. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "When an inmate's request for consideration under . . . [Section] 3582(c)(1)(A) is denied by the General Counsel, . . . . [the] denial constitutes a final administrative decision." 28 C.F.R. § 571.63(b); *see also* BOP Program Statement 5050.50, *Compassionate Release/Reduction in Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, https://www.bop.gov/policy/progstat/5050_050_EN.pdf. [hereinafter BOP Program Statement 5050.50]. "Because a denial by the General Counsel or Director, [BOP], constitutes a final administrative decision, an inmate may not appeal the denial through the Administrative Remedy Procedure." 28 C.F.R. § 571.63(d); *see also* BOP Program Statement 5050.50.

Here, the Government argues that Defendant has failed to exhaust his administrative

---

[4] As discussed below, because the Court finds that there are no "extraordinary and compelling reasons" to grant compassionate release, it will not consider the applicable factors set out in Section 3553(a). *See United States v. Viteri*, No. 19-044, 2020 WL 3396804, at *5 n.7 (D.N.J. June 19, 2020) (declining to consider the Section 3553(a) factors where the court found that "'extraordinary and compelling reasons' [we]re not present").

5

remedies because his submissions for compassionate release do not address the COVID-19 concerns that are now before this Court. (D.E. 408 at 12–15.) The Court will not deny Defendant's motion on this ground. Defendant has not presented his COVID-19 argument to the BOP in any application for compassionate release because the COVID-19 pandemic post-dates Defendant's October 2016 and April 2019 requests. (*See* D.E. 406-2, Ex. A; D.E. 408-2, Ex. A; *see also* May 17, 2017 BOP Denial; Aug. 6, 2019 BOP Denial.) The BOP General Counsel's May 2017 and August 2019 denials are considered final administrative decisions that cannot be appealed. *See* 28 C.F.R. § 571.63(b) and (d); *see also* BOP Program Statement 5050.50. Accordingly, Defendant satisfies Section 3582(c)(1)(A)'s exhaustion requirement at this juncture, notwithstanding the lack of COVID-19 concerns in his prior submissions. *See United States v. Brown*, No. 05-227, 2020 WL 2091802, at *3–4 (S.D. Iowa Apr. 29, 2020) (noting that the statute does not state that "the reasons presented to the warden must mirror those presented to the district court" and "precedent dictates it is inappropriate to require issue exhaustion"); *accord United States v. Torres*, No. 87-593, 2020 WL 2815003, at *3–5 (S.D.N.Y. June 1, 2020) (holding that issue exhaustion is not required before a court may consider a motion for compassionate release).

### B. Extraordinary and Compelling Reasons

Congress tasked the Sentencing Commission to define "extraordinary and compelling reasons" that would warrant a reduction in sentence. *See* 28 U.S.C. § 994(t). The Sentencing Commission's Policy Statement identifies four categories of "extraordinary and compelling reasons" that a court may consider "[u]pon motion of the Director of the [BOP] under 18 U.S.C. § 3582(c)(1)(A),"[5] including: (A) the defendant's medical condition; (B) the defendant's age of at

---

[5] Before 2018, only the Director of the BOP could file compassionate release motions. *United States v. Rodriguez*, No. 03-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020). The Sentencing Commission has not updated its Policy Statement since Congress enacted the FSA, which now allows prisoners to file motions for compassionate release directly with the court. *Epstein*, 2020 WL 2537648, at *3 (citing *Rodriguez*, 2020 WL 1627331, at *3). Although

least 65-years combined with "serious deterioration in physical or mental health because of the aging process" when he or she "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less;" (C) the defendant's unique family circumstances pertaining to caregivers of the defendant's minor children or spouse; or (D) other extraordinary and compelling reasons "[a]s determined by the [BOP] . . . other than, or in combination with, the reasons described" in the prior provisions. U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13, cmt. n.1 (A)–(D).[6]

Here, Defendant clearly does not meet subsections (B) and (C) of Application Note 1. Although Defendant will turn 65-years-old in the next year (*see generally* 408-4, Ex. C (stating Defendant's date of birth)), he has not served ten years or seventy-five percent of his sentence.[7] *See* U.S.S.G. § 1B1.13, cmt. n.1 (B). Rather, Defendant has served approximately six and a half years, which is less than half of his fourteen-year sentence. (*See* D.E. 406-1 at 4, 18; Billings Decl. ¶ 8(a).) Nor does Defendant assert any unique family circumstances. *See* U.S.S.G. § 1B1.13, cmt. n.1 (C); (*see generally* D.E. 406-1, 409.) Accordingly, the Court will address only Defendant's medical conditions and other "extraordinary and compelling reasons" under the Policy Statement's

---

courts have recognized that the Policy Statement may serve as helpful guidance in their assessment of defendants' requests for compassionate release, a majority of courts have found that it "does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *Rodriquez*, 2020 WL 1627331, at *4 (alteration in original) (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 581–82 (M.D.N.C. 2019)).

[6] As noted above, the Policy Statement was intended to guide the BOP's discretion under the prior version of Section 3582(c)(1)(A). *See Epstein*, 2020 WL 2537648, at *3. There is currently a dispute as to whether a court may determine if "extraordinary and compelling reasons" exist under the Policy Statement's catch-all provision. *Rodriquez*, 2020 WL 1627331, at *2–6. As one court adopting the majority view has found, preventing such consideration "would be antithetical to the First Step Act" because it would reward those prisoners who await the BOP's assessment under the catch-all provision and hinder those prisoners who file a motion with the court 30 days after a warden fails to respond to a request for compassionate release. *See id.* at *5–6. This Court will follow the majority approach and consider Defendant's request under the catch-all provision, as it relates to his COVID-19 concerns.

[7] Defendant may renew his request under section (A) of Application Note 1 once he has served seventy-five percent of his sentence.

catch-all provision.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A) & (D).

### i. Defendant's Medical Conditions

Medical conditions that meet the "extraordinary and compelling" requirement are (i) "terminal illness" (defined as a "illness with an end of life trajectory"[8] although "[a] specific . . . probability of death within a specific time period[] is not required"), or (ii) "serious physical or medical condition, . . . serious functional or cognitive impairment, . . . or deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i)–(ii).  Courts have noted that "a compassionate release due to a medical condition is an extraordinary and rare event."  *See, e.g.*, *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

Although this Court certainly does not minimize Defendant's medical complications, the record fails to support Defendant's argument that he suffers from a "terminal illness."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(i); *see also* Aug. 6, 2019 BOP Denial at 2 (finding that "there is no documentation indicating a terminal prognosis or debilitated condition").  Although Defendant argues that the only treatment for malignant hypertension—renal denervation—is unavailable in Kentucky, he does not contend that his malignant hypertension imposes a certain "end of life trajectory" should he not receive that treatment.  (*See* D.E. 406-1 at 14–15.)  Defendant does, however, claim that without such treatment, he will continue to suffer strokes, but admits that it is "unknown" whether a stroke will further deteriorate his physical condition *or* whether it could eventually result in his fatality.  (*Compare id.*, *with* D.E. 409 at 5); *see also United States v. Dusenbery*, No. 91-291, 2019 WL 6111418, at *2–3 (N.D. Ohio Nov. 18, 2019) (denying

---

[8] The Policy Statement provides examples of terminal illnesses including "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).

compassionate release where defendant asserted that the BOP was "ill-equipped to properly treat him or give him the attention he needs" for his kidney failure, noting that courts "have denied compassionate release to defendants with equally difficult medical conditions").

Moreover, this Court already considered Defendant's current medical condition when imposing Defendant's sentence in 2014. (*See* Tr. at 46:2–24; 49:5–8.) Because this Court is familiar with Defendant's specific medical challenges that existed *prior to* his sentencing, it finds the FMC Warden's May 3, 2017 letter recommending modification of Defendant's release based on medical staff's classification of his conditions as "incurable and progressive in nature" to be unpersuasive. (*See* 406-3, Ex. B.) The Court remains satisfied that the BOP can appropriately address Defendant's aliments, and the Court's review of Defendant's extensive medical records indicates that he continues to receive medication for his conditions, including malignant hypertension. (*See* Tr. 46:16–20; *see generally* 408-4, Ex. C; 408-5, Ex. D; 408-6, Ex. E; 408-7, Ex. F; 408-8, Ex. G); *see also United States v. Goode*, No. 14-810, 2020 WL 58272, at *2, 6 (S.D.N.Y. Jan. 6, 2020) (stating that "[t]he 'terminal' nature of [defendant's] condition is no different than it was when [the court] imposed [her] sentence," and finding that "defendant's medical situation, debilitated though she be, does not reach the level at which BOP Guidelines suggest consideration for compassionate release").

In addition, a review of Defendant's medical records suggests possible malingering prior to (*see* Tr. 42:22–43:1) and during his incarceration. For example, Defendant refused to take his blood pressure medication and refused to attend a scheduled consultation for renal denervation. (*See* 408-6, Ex. E at 58, 161; 408-8, Ex. G at 256, 339.) Defendant's medical records also indicate that he attempted to manipulate his blood pressure readings and was non-compliant with medical instructions. (*See* 408-7, Ex. F at 25, 60 (stating that defendant would tense up because "he [was]

9

obviously manipulating [his body] for higher blood pressures"); 408-6, Ex. E at 86, 100–101, 140, 148, 164 (stating that blood pressures were likely inaccurate "due to behaviors of the patient during the data collection").

Accordingly, the Court finds that the evidence does not reflect that Defendant suffers from a "terminal illness" as defined by the Sentencing Commission.[9] *See United States v. Alexander*, No. 19-032, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release where the BOP appeared to "adequately manag[e] [d]efendant's medical care," including hypertension which was controlled using medication).

Second, under U.S.S.G. § 1B1.13, Application Note 1 (A)(ii), Defendant argues that his inability "to provide self-care in a correctional setting is substantially diminished, if not completely impaired" because he cannot complete many activities of daily living ("ADLs") without assistance, including bathing and oral care. (D.E. 406-1 at 16; D.E. 409 at 6.) For example, Defendant asserts that in the F-4 Unit, his meals and medicine are brought directly to his room, and he receives assistance with medication, meals, bed linens, showering, and laundry.[10] (D.E. 409 at 6.)

The Court's review of Defendant's medical records reflects that he has been mostly independent with his ADLs. (*See* D.E. 408-4, Ex. C at 2 (noting that on April 26, 2020, Defendant

---

[9] Moreover, in response to the Government's opposition, Defendant admits that the results of his most recent chest scan indicate that "his lung cancer appears to be in remission." (D.E. 409 at 6.) Accordingly, without any documentation for the Court's consideration regarding the purported relatedness of weight loss and lung cancer (or another illness), it declines to find that Defendant's unexplained weight loss (*see id.*) is indicative of a "terminal illness."

[10] The Court notes inconsistencies in Defendant's briefing. First, Defendant claimed that he *can* complete activities of daily living like dress himself, shower, and brush his own teeth, but subsequently asserted that he requires assistance "in bathing, mouth care, and changing linens." (*Compare* D.E. 406-1 at 16, *with* D.E. 409 at 6.)

In addition, Defendant initially maintained that he required assistance from an inmate companion and has been assigned numerous untrained inmate companions who fail to remain with Defendant all day. (*See* D.E. 406-1 at 17.) Defendant clarified, however, that following his July 2019 stroke and subsequent transfer to FMC's F-4 Unit, medical staff assists him with tasks involving "medication, meals, laundry, and making his bed." (D.E. 409 at 6.)

"continues to be independent with ADLs"); *see also id.* at 12, 29, 33, 65, 67.) These records also indicate that Defendant has reported some difficulty with transfers and receives certain assistance with hygiene-related tasks such as bathing, oral care, and changing linens. (*See id.* at 12, 31, 65.) However, when viewed in light of the care Defendant receives in FMC's F-4 Unit, his overall ability to provide self-care does not appear to be substantially diminished as defined by the Sentencing Commission.[11] *See United States v. Rodriguez-Orejuela*, No. 03-20774, 2020 WL 2050434, at *6–7 (S.D. Fla. Apr. 28, 2020) (noting that defendant could still provide sufficient self-care in his ADLs even with use of a walker and/or wheelchair for mobility); *United States v. Bunnell*, No. 14-119, 2019 WL 6114599, at *1–2 n.1 (D. Ariz. Nov. 18, 2019) (finding no substantially diminished ability to provide self-care where defendant was confined to a wheelchair and had "arthritis, sciatica, bulging lumbar discs 2-5, scoliosis, and degenerative disease causing central stenosis in his spine," noting that his records verified his ability to perform all ADLs without issues).

### ii. Other Extraordinary and Compelling Reasons

Finally, Defendant argues that the threat of COVID-19 at FMC puts him at an increased risk of death or developing severe symptoms should he contract the virus in light of his medical challenges and physical limitations. (D.E. 406-1 at 8–12.) The Third Circuit has stated that "the mere existence of COVID-19 in society and the possibility that it may spread to [or within] a particular prison alone cannot independently justify compassionate release." *See Raia*, 954 F.3d at 597. This Court realizes that Defendant has serious undisputed medical conditions.[12] However,

---

[11] Because the Court thoroughly considered Defendant's medical challenges in imposing his sentence (*see* Tr. at 46:2–24; 49:5–8), Defendant's argument that his ADLs were limited *before* his sentencing occurred will not be considered. (*See* D.E. 406-1 at 16.)

[12] Notably, the Government admits that Defendant's medical aliments, including coronary heart disease and strokes, could increase the risk of serious illness should he contract COVID-19. (D.E. 408 at 25.)

11

the Court remains satisfied that FMC is adequately addressing Defendant's medical challenges in the F-4 Unit, even under the circumstances presented by the COVID-19 pandemic.[13]

Most significantly, Defendant resides in FMC's F-4 Unit reserved for those inmate-patients "in need of intensive primary care management which requires 24-hour nursing services." (Billings Decl. ¶ 8(b); *see* D.E. 408 at 20, 25.) Defendant is the only occupant in his hospital-style room, which inevitably allows for social distancing. (*See* Billings Decl. ¶ 8(b); *see also* D.E. 408 at 26.) Although FMC has had 283 confirmed COVID-19 cases among its entire inmate population, there were only 5 active cases as of June 24, 2020; four inmates with active cases are at FMC, and one inmate is hospitalized. (Billings Decl. ¶¶ 6–7.) And, while 11 FMC staff members tested positive for COVID-19, there were no active cases among staff as of June 24, 2020. (*Id.* ¶ 6.) All inmates in the F-4 Unit have been tested for COVID-19, including Defendant who tested negative twice on May 21 and 29, 2020. (*Id.* ¶ 8(c).) Significantly, also as of June 24, 2020, there were no active COVID-19 cases in the F-4 Unit where Defendant resides, and there has only been one confirmed case of COVID-19 in the F-4 Unit since the onset of the virus. (*Id.* ¶ 6.)

The F-4 Unit also has preventative measures in place to combat the spread of COVID-19. For example, every inmate's vital signs in the F-4 Unit are checked at least once per day, which includes temperature and oxygen saturation checks; and inmates with high temperatures or who express having COVID-19 symptoms are tested for the virus. (*Id.* ¶ 8(c).) Daily rounds by medical staff are conducted, and inmates' sick calls are "triaged and evaluated." (*Id.* ¶ 3(d).)

---

[13] Defendant initially argued that his debilitated physical condition makes him dependent on another inmate for assistance and because he suffers from vision loss, he cannot determine whether the surfaces he touches are clean, or if an inmate assistant practices good hygiene. (D.E. 406-1 at 10.) However, Defendant ultimately states that after suffering a stroke in July 2019, he now receives assistance with his medication, meals, laundry, and bed linens from medical staff in the F-4 Unit, not an inmate companion. (*See* D.E. 409 at 6.)

Asymptomatic inmates with a risk of exposure and symptomatic inmates must quarantine or isolate until they are cleared by medical staff or test negative for COVID-19. (*Id.* ¶ 3(e).)

In addition to educating inmates and staff on the Centers for Disease Control and Prevention's practices to prevent the virus's spread, all inmates and staff are provided face coverings. (*Id.* ¶ 3(a)–(b).) Inmates were provided three cloth face masks which are laundered at FMC weekly, and have been instructed to wear their face coverings at all times, with the exception of eating, drinking, and sleeping. (*Id.* ¶ 3(b).) Inmates have also been instructed to social distance from others by six feet. (*Id.*) FMC staff are provided three paper face coverings each week. (*Id.*)

Furthermore, FMC's cleaning protocols have been modified to help prevent the spread of COVID-19, which includes disinfecting common areas like "windows, ledges, toilets, sinks, water fountains, door handles, and handrails" at least once a day, and disinfecting frequently touched surfaces like inmate phones and computers after every use. (*Id.* ¶ 3(c).) Disinfectant supplies are replenished in every unit twice a week, while other supplies are restocked every other week, or earlier when requested. (*Id.*) Unit orderlies are trained in the proper application of cleaning chemicals. (*Id.*) Inmates are also provided a hygiene kit with soap, a toothbrush, and toothpaste; although these kits are typically available to inmates who cannot purchase them, FMC has provided the kits at no charge during the COVID-19 pandemic. (*Id.* ¶ 3(e).) As of June 24, 2020, no inmate in the F-4 Unit has been denied a hygiene kit. (*Id.*)

FMC also has procedures in place for newly admitted inmates, as well as third parties' access to the facility. All new admissions are screened for COVID-19 symptoms and exposure; those who are asymptomatic but with risk of exposure are quarantined. (*Id.*) FMC suspended all social visits and tours as of March 13, 2020, until further notice. (*Id.* ¶ 3(g).) Inmates have increased telephone privileges and may visit with counsel on a case-by-case basis after they have

been screened for infection. (*Id.*) Only essential contractors may enter the facility and they must be screened for COVID-19 symptoms and risk factors. (*Id.* ¶ 3(f).) Additionally, all FMC staff undergo daily COVID-19 screenings before reporting to their post. (*Id.* ¶ 3(e).)

Because it is clear that FMC is managing Defendant's medical care and has implemented numerous measures to combat the spread of COVID-19—particularly where Defendant resides in the F-4 Unit which had only one confirmed case of the virus—Defendant's motion for compassionate release based on "other extraordinary and compelling reasons" is denied. *See e.g.*, *United States v. Holmes*, No. 08-462, 2020 WL 3077496, at *4 (M.D. Pa. June 10, 2020) (denying motion for compassionate release despite defendant's chronic medical condition and the COVID-19 pandemic where it appeared that his condition was under control and the facility had no confirmed COVID-19 cases); *accord United States v. Hammond*, No. 18-184, 2020 WL 2126783, at *5 (W.D. Pa. May 5, 2020) (denying compassionate release because defendant regularly received his high blood pressure medication, there was no indication that the facility failed to address his medical needs and "took the necessary steps and precautions to help stop the spread of COVID-19" among the inmate population).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Compassionate Release is **DENIED**. An appropriate order follows.

                                                             /s/ Susan D. Wigenton  
                                             **SUSAN D. WIGENTON, U.S.D.J.**

Orig:       Clerk  
cc:         Parties